J-S29045-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| G.S. and J.S., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellees | |
| v. | |
| E.J.T., | |
| Appellant | No. 177 WDA 2015 |

Appeal from the Order Entered December 29, 2014,
in the Court of Common Pleas of Somerset County,
Orphans' Court, at No(s): Case #13 Adoption 2014

BEFORE:  PANELLA, MUNDY, and STRASSBURGER[*], JJ.

MEMORANDUM BY STRASSBURGER, J.:  **FILED JUNE 24, 2015**

E.J.T. (Mother) appeals from the order entered December 29, 2014, in the Court of Common Pleas of Somerset County, which terminated involuntarily her parental rights to her minor son, G.M.T. (Child).[1]  We affirm.

Child was born in October of 2007.  In June of 2008, Mother was incarcerated, and she placed Child in the care of his great-aunt, J.S. (Great-Aunt), and his great-uncle, G.S. (Great-Uncle) (collectively Appellees).  Mother was released after 90 days, but again was incarcerated from January of 2009 until January of 2011, during which time Child continued to reside

_____

[*] Retired Senior Judge specially assigned to the Superior Court.

[1] The orphans' court entered an order terminating the parental rights of Child's father, K.A. (Father), that same day.  Father is not a party to the instant appeal.

with Great-Aunt and Great-Uncle. After Mother was released, Great-Aunt and Great-Uncle attempted to transfer Child back into Mother's custody. However, Mother relapsed into drug addiction in November of 2012, and was incarcerated once more in December of 2012.

On July 23, 2014, Great-Aunt and Great-Uncle filed a petition to terminate Mother's parental rights to Child involuntarily, along with a report of intention to adopt Child. A termination hearing was held on December 11, 2014. On December 29, 2014, the orphans' court entered its order terminating Mother's rights. Mother timely filed a notice of appeal.[2]

Mother now raises the following issue for our review. "Whether the [orphans'] court erred by terminating the natural mother[']s parental rights

---

[2] Mother was represented by counsel during her termination hearing, but filed her notice of appeal *pro se*. The certified record does not contain an order permitting Mother's trial counsel to withdraw. On January 20, 2015, Mother filed an application for assignment of counsel, requesting that an attorney be appointed to represent her on appeal. The orphans' court appointed Mother's present counsel on January 23, 2015.

Additionally, Mother did not file a concise statement of errors complained of on appeal at the same time as her notice of appeal, as required by Pa.R.A.P. 1925(a)(2)(i). The orphans' court did not order Mother to file a concise statement, but instead "reviewed a letter from [Mother] to the Public Defender's Office," which is not contained in the certified record, and tried to address the complaints Mother raised therein. Orphans' Court Opinion, 2/9/2015, at 1 (unnumbered pages). This Court also did not order Mother to file a concise statement. Because Appellees have not objected or claimed any prejudice as a result of Mother's failure to file a concise statement, we have accepted Mother's statement in reliance on our decision in *In re K.T.E.L.*, 983 A.2d 745, 748 (Pa. Super. 2009) (holding that a mother's failure to comply strictly with Pa.R.A.P. 1925(a)(2)(i) did not warrant waiver of her claims, as there was no prejudice to any party).

under 23 Pa.C.S.[] §[]2511 (a)(1), 23 Pa.C.S.[] §[]2511 (a)(2), and 23 Pa.C.S.[] §[]2511 (b)." Mother's brief at 1.

We consider Mother's claim mindful of the following.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our courts apply a two-part analysis in reviewing a decree terminating parental rights. As we explained in *In re L.M.*, 923 A.2d 505 (Pa. Super. 2007),

[i]nitially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

-3-

*Id.* at 511 (citations omitted).

In this case, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(2) and (b), which provide as follows.

> **(a) General Rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>            *   *   *
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>            *   *   *
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the orphans' court abused its discretion by finding grounds for terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted)).  "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.  To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties."  *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).  "[A] parent's incarceration is relevant to the section (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates."  *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (discussing *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012)).

Instantly, the orphans' court concluded that Mother is incapable of parenting Child, and that Mother's parental incapacity will continue indefinitely.  Orphans' Court Opinion, 12/29/2014, 9 (unnumbered pages).  The court emphasized Mother's failure to care for Child for the majority of his life, and the possibility that Mother may again relapse into drug addiction.  *Id.*  Mother argues that she soon will be out of prison, and that "her incapacity … will no longer be a factor."  Mother's brief at 17, 20.

Mother highlights her efforts at maintaining a relationship with Child while incarcerated, and the fact that she placed Child with Great-Aunt and Great-Uncle. *Id.* at 17, 19. According to Mother, section 2511(a)(2) is inapplicable in the instant matter, because Child is receiving proper parental care, control, and subsistence from Great-Aunt and Great-Uncle, and because she assisted Great-Aunt and Great-Uncle by allowing them to withdraw money from a savings account to help provide for Child.[3] *Id.* at 17-20.

After a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion by findings grounds for terminating Mother's parental rights under section 2511(a)(2). During the termination hearing, Great-Aunt testified that Mother appeared to be making progress following her release from incarceration in January of 2011. N.T., 12/19/2014, at 26-27. Mother was able to find a job and was "going to the methadone plan," and Child was spending two nights per week with Mother. *Id.* at 27. However, in November of 2012, Mother began to attend treatment at the Twin Lakes rehabilitation facility. *Id.* at 22-23. Great-Aunt explained that Mother left the facility, and violated her probation. *Id.* at 28. Mother then overdosed while incarcerated at the Somerset County Jail, and faced additional criminal charges as a result. *Id.* at 28-29.

---

[3] Mother devotes a significant portion of her brief to discussing the evidence in this matter in relation to Section 2511(a)(1). However, as noted *supra*, Mother's parental rights were terminated under Section 2511(a)(2) only.

-6-

Mother testified that she has been a drug addict for about 10 years, since she was 16 years old, and that her drug of choice is heroin. *Id.* at 78-79. Mother claimed that, after her release in 2011, she "came to see [Child] and visit him as much as I could …." *Id.* at 51. According to Mother, Child "was with me … between four and five[] days a week" from April of 2011, until Mother relapsed in November of 2012. *Id.* at 52-53, 56-57. Mother also stated that Child was with her "at least five days a week." *Id.* at 57. Mother explained that she most recently was incarcerated on December 7, 2012, that she currently is serving two concurrent 2½-5 year sentences of incarceration, and that her minimum sentence date is in April of 2015. *Id.* at 54, 77. Mother was not sure what her maximum sentence date is, but she believed it to be in 2016. *Id.* at 77-78. Mother noted that her incarceration will be followed by a special probation sentence with a maximum sentence date in 2026.[4] *Id.* at 77.

Mother further testified that she is attending drug treatment while incarcerated, and that she is "getting ready to start the motivational boot camp which is something I've never ever done before, and that will also give me the opportunity to be able to be home sooner but start out in a … different town …." *Id.* at 76, 90. Mother hoped to be "back out on the

_____

[4] Mother noted that, during her current incarceration, she has allowed Great-Aunt to withdraw money from a savings account in order to buy things for Child. N.T., 12/11/2014, at 66 ("[I]f he needed a bike or something like that, she would take the money from my savings account and get him a bike.").

street" by Thanksgiving of 2015. *Id.* at 80. However, Mother conceded that "it will take a while" until she is able to take care of Child. *Id.* at 71. She noted that "it's going to be hard to get a job with my criminal record, … but it's been done, and I can do it." *Id.* at 90.

Accordingly, the record supports the finding of the orphans' court that Mother's parental incapacity has caused Child to be without essential parental care, control, or subsistence, and that Mother cannot, or will not, remedy this incapacity. Mother is incarcerated, and it is not clear when, if ever, Mother will be able to care for Child. While Mother contends that her parental incapacity will be remedied when she is released from incarceration, Mother's argument fails to address the underlying cause of her incarcerations. Specifically, Mother has a lengthy history of drug addiction that she has been unable to remedy. It was reasonable for the court to conclude that Mother may again relapse. In the event of a relapse, there is a considerable risk, if not a likelihood, that Mother will be sentenced to another period of incarceration.

We also reject Mother's contention that she provided Child with parental care, control, or subsistence by placing Child in the care of Great-Aunt and Great-Uncle, and by allowing Great-Aunt and Great-Uncle to use money from her savings account. Tellingly, Mother cites no authority for the proposition that these actions are sufficient to avoid termination under Section 2511(a)(2). To the contrary, this Court has emphasized that

"'[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.'" ***In re E.A.P.***, 944 A.2d 79, 83 (Pa. Super. 2008) (quoting ***In re B.,N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005)). No relief is due.

We next consider whether the trial court abused its discretion by findings that section 2511(b) supports termination. We have discussed our analysis under section 2511(b) as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Here, the orphans' court found that it would meet the needs and welfare of Child to remain in the care of Great-Aunt and Great-Uncle, where Child is thriving. Orphans' Court Opinion, 12/29/2014, at 10 (unnumbered pages). The court further concluded that there was "no evidence to support an argument that there is a sufficient parent-child bond between Mother and the Child such that [] he would be harmed by a severance of the parental relationship." *Id.* Mother contends that she has a bond with Child and, if this bond is severed, "the damage that will be caused will have some effect in the child's life." Mother's brief at 22-23. Mother argues that it would be best to leave Child in the care of Great-Aunt and Great-Uncle until she is able to remedy her parental incapacity. *Id.*

Again, we conclude that Mother is not entitled to relief. Great-Aunt testified that she and Great-Uncle are caring for Child and providing for his needs, that Child is doing well in school, and that he is "very happy." N.T., 12/11/2014, at 34-37, 40-41, 44-45, 110-11. Great-Aunt and Great-Uncle have never described themselves to Child as his mother and father, and Child usually refers to them by their first names. *Id.* at 21, 35, 102. However, Child sometimes refers to Great-Aunt and Great-Uncle as his "mom" and "dad" while speaking to his friends. *Id.* at 35-36. Great-Aunt

explained that Child knows Mother is his mother and refers to her as "mom," and that Child sometimes talks about Mother, but "[n]ot a whole lot." *Id.* at 20, 22, 37, 102.

Great-Aunt further stated that Mother writes to Child, sends him cards, and calls him on the phone. *Id.* at 22, 31-32, 35, 99. When Mother calls Child, Child will be excited to talk to Mother, but will only be interested in speaking with her for short periods of time. *Id.* at 42, 102. Sometimes, Great-Aunt will show Child a card Mother sent him, and Child will be uninterested. *Id.* at 102. Great-Aunt indicated that it has been "over a year" since Child has asked when Mother is coming home. *Id.* at 113. Both Great-Aunt and Great-Uncle testified that Mother and Child had a "good" relationship prior to Mother most recent incarceration. *Id.* at 93, 126. However, Great-Uncle explained that he recently tried to speak to Child about Mother and that "I could tell it upset him, and … he didn't want to hear about it." *Id.* at 127.

Mother agreed that she calls Child on the phone and sends him letters and pictures while incarcerated. *Id.* at 65-66. Mother also stated that she had a friend mail toys to Child. *Id.* at 66. Mother explained that, sometimes, Child "doesn't really want to talk much" on the phone, and that, other times, Child will be "really excited to tell me what was going on." *Id.* at 67. Mother stated that she and Child became "really close" during the

time Mother last was out of jail, and that she wants to "continue building the relationship that I have with my son." *Id.* at 68, 75.

Mother's mother (Maternal Grandmother) testified that Mother and Child spent "a lot of time together" prior to Mother's most recent incarceration, that they "get along perfectly," and that they "mean everything to each other." *Id.* at 150. However, Maternal Grandmother admitted that there are times when Child "doesn't want to talk" when Mother calls him on the phone, "[s]o he'll say hi, bye, and that's pretty much it. Then there's other times where he'll talk the whole 20 minutes that she can, you know, talk. And … he'll say, hey, call me back. So she would hang up and call back again." *Id.* at 155. Maternal Grandmother stated that Child "definitely" recognizes Mother as his Mother, that Child loves Mother, and that Child talks about Mother "[s]ometimes." *Id.* at 155, 158.

Thus, the record supports the finding of the orphans' court that Child is thriving in the care of Great-Aunt and Great-Uncle, who have cared for Child for most of his life, and that it would serve the needs and welfare of Child to be adopted. While Child maintains a relationship with Mother, this relationship has been limited by the circumstances of Mother's incarceration. Further, under the facts of the instant case, it is clear that any benefits that Child's relationship with Mother might provide are outweighed by Mother's parental incapacity, and by Child's need for permanence and stability. *See* ***C.D.R.***, 111 A.3d at 1220 (concluding that the appellant mother's bond with

C.D.R was outweighed by the mother's "repeated failure to remedy her parental incapacity," and by C.D.R.'s need for permanence and stability).

Accordingly, because we conclude that the orphans' court did not abuse its discretion by terminating Mother's parental rights to Child involuntarily, we affirm the order of the orphans' court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  6/24/2015